28238. SPIVEY *v.* THE STATE.

DECIDED APRIL 11, 1940.

*W. A. Dampier, L. F. Watson,* for plaintiff in error.

MacINTYRE, J. Morgan Spivey was charged with a violation of the banking law (Code, § 13-9933), for that he "with intent to defraud did make, draw, and utter or deliver a certain draft upon the following tenor and effect to wit: 'The Blackshear Bank, Blackshear, Georgia, April 14, 1939. At sight pay to the order of Pierce County Stock Yard . . $759.99, seven hundred fifty-nine and 99/100 dollars, value received, and charge same to account of W. M. Spivey. To D. G. Adams, Dublin. Through Farmers and Merchants Bank,' said draft being presented for payment, when the same was refused because of insufficient funds or credit or arrangement with such bank for the payment of such draft upon its presentation, and by the giving of said draft the Pierce County Stock Yard was defrauded out of the sum of $759.99, all to their loss and injury." The defendant was convicted by a judge without a jury. His motion for new trial was overruled, and he excepted. It appears from the evidence that the defendant obtained cattle and gave this draft therefor. The State's witnesses testified, that the draft was drawn on D. G. Adams of Dublin, Georgia, through the Farmers and Merchants Bank of that city; that the draft was deposited for collection the day after it was given; and that it came back unpaid, with a notation "unable to present." There was no evidence on the part of the State as to why this draft was not presented to Mr. Adams, as contemplated by all the parties concerned at the time it was signed. The gravamen of the offense of cheating and swindling is the intent to defraud at the time of the giving of the draft and the obtaining of the property. The testimony of the sheriff, to wit, "Mr. Spivey [the defendant] has talked with me

about this transaction, and told me that after they failed to present the draft to D. G. Adams for payment and he found out it was not paid, he would have paid it and taken care of the draft himself but for the reason, after the cows were disposed of, which he bought, that he got drunk, and had a loss of about $200 in the sale of the cows, and did not have money enough to take up the draft after he found out that it had not been presented to Mr. Adams or been paid," was not sufficient, in connection with the other testimony, which merely went to the fact that a draft was drawn and not presented or paid, to carry the burden for the State that the defendant, before or at the time of the signing of the draft and the delivery of the property, had not made arrangements for its payment by Adams if it had been presented within a reasonable time. The statement of the sheriff, at most, could show only a subsequent intent; and there was nothing in the testimony to show that it related to the time of the drawing of the draft and the obtaining of the property.

If there was not a false pretense at the time of the drawing of the draft and when the property was obtained, subsequent changes in conditions could not so relate as to fasten upon the person making it an intent at that time to defraud. 2 Brill's Cyclopedia Criminal Law, 1895, § 1245. Especially is this true when a witness who lived in Dublin testified that he had known D. G. Adams all his life, that Adams lived in Dublin on Telfair Street, and was a trader, "that is, he buys and sells property for a profit, had no regular position that he knows of, but is widely known in Dublin and Laurens County as a business man and trader."

In his statement the defendant said: "I live at Dublin, Georgia; was born and raised in Laurens County. The way this transaction came about was: I met Mr. D. G. Adams on the street, known him for a long time, and as it has been my business for some time to buy and sell live stock, Mr. Adams and myself decided that we could make some profit by buying a truck-load of cows and reselling them. I told Mr. Adams that I intended to come to Blackshear, Georgia, in Pierce County, as the stock-yard here was a good place to buy cattle, and that I could buy them cheaper here than anywhere else I knew of; and he agreed with me. The understanding was, between me and Mr. Adams before I came down here to buy these cows, that I would draw a draft on him, D. G. Adams, and that he would pay same when presented to him. I did draw this

draft here, which has been talked about, in good faith at the time; but after I had sustained a loss in the sale of these cows, and the draft, as it says on the back, had never been presented to Mr. Adams for payment, I was arrested, and he has never tried to help me get up the money to pay the same, and I have never been able to pay these people their money. It was not my intention at the time I signed this draft to beat these people out of one dime, and it is not my intention now. I intend to pay them back every dollar, but I have not been able to do this until now; but if I get a chance to get out and make this money, although Mr. Adams was to pay this draft. I know I signed it, and I will pay it myself, if I live. That is all I have to say." We do not think the evidence showed beyond a reasonable doubt that the defendant was guilty of cheating and swindling.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*